U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JAN -8 AM 11: 04

CLERK
BY_____
DEPUTY CLERK

LYNN M.,                                )
                                        )
        Plaintiff,                      )
                                        )
v.                                      )        Case No. 5:17-cv-80
                                        )
NANCY A. BERRYHILL, Acting              )
Commissioner of Social Security,        )
                                        )
        Defendant.                      )

**ORDER**
**(Docs. 12, 15)**

Plaintiff Lynn M. brings this action under 42 U.S.C. § 405(g), requesting reversal of the

decision of the Commissioner of Social Security denying her applications for disability insurance

benefits (DIB) and supplemental security income (SSI). (Doc. 5.) Pending before the court is

Plaintiff's motion to reverse the decision of the Commissioner (Doc. 12) and the Commissioner's

motion to affirm (Doc. 15). For the reasons stated below, Plaintiff's motion is DENIED, and the

Commissioner's motion is GRANTED.

## Background

Plaintiff was 41 years old on her alleged disability onset date of December 15, 2014.

She states that she is unable to work due to severe depression, posttraumatic stress disorder

(PTSD), fibromyalgia, and irritable bowel syndrome (IBS). (AR 855.) She asserts that her

PTSD stems from a time when she was younger (AR 857–58), and that the symptoms worsened

when her parents passed away in 2011 and 2012. (AR 858.) She states that she has experienced

severe depression since around the time that her parents died. (*See* AR 855.) She was also

diagnosed with fibromyalgia around that time. (*See* AR 858–59.) She began experiencing IBS

symptoms after her children were born, but testified that the symptoms worsened around 2011. (AR 859–60.)

Plaintiff is divorced with two adult children. (AR 845.) She lives with her boyfriend. (*Id.*) She has a driver's license and is able to drive. (AR 846.) She graduated from high school and earned an associate's degree in nursing around 2003, although she was not able to pass the requisite examinations to obtain a nursing license. (*Id.*) Plaintiff's last employment was at a hair salon, which she left in 2011 to care for her ailing father. (AR 847.) She previously worked as a stock clerk and as a nurse assistant and secretary. (*See* AR 849–54.)

Regarding her daily activities, Plaintiff testified that she is able to take care of her personal hygiene. (AR 864.) She does the laundry once a week but testified that it takes her a while to fold the laundry and sometimes she does not fold it at all. (AR 865.) She testified that she could never stand and do a whole sink of dishes. She has no glass in her house because her hands have been going numb since around 2015 and she drops things. She likes to draw and color, and does crochet depending on how her arms and hands feel. She testified that she does a lot of reading and that she walks every day. (*Id.*) Her doctors have encouraged walking, and she typically walks for 15 minutes down and up her long driveway. (AR 865–66.) Her favorite hobby is gardening, which she does up to a half hour a day, but which she cannot do alone because she sometimes cannot get up off the ground by herself. (AR 866.)

Plaintiff filed applications for DIB and SSI on March 30, 2015. (AR 913–14.) Her claims were denied initially on June 23, 2015 (*id.*), and upon reconsideration on July 24, 2015. (AR 947–48.) She requested a hearing, and Administrative Law Judge (ALJ) Joshua Menard conducted a hearing on August 4, 2016. (AR 841–76.) Plaintiff appeared at the hearing and was represented by Marc Pepin. Vocational Expert (VE) James Soldner also testified. ALJ Menard

issued an unfavorable decision on September 19, 2016. (AR 24–35.) The Appeals Council denied Plaintiff's request for review (AR 1), and she appealed to this court on May 10, 2017. (Doc. 5.)

## ALJ Decision

Social Security Administration regulations set forth a five-step, sequential evaluation process to determine whether a claimant is disabled. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). First, the Commissioner considers "whether the claimant is currently engaged in substantial gainful activity." *Id.* Second, if the claimant is not currently engaged in substantial gainful activity, then the Commissioner considers "whether the claimant has a severe impairment or combination of impairments." *Id.* Third, if the claimant does suffer from such an impairment, the inquiry is "whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments." *Id.* Fourth, if the claimant does not have a listed impairment, the Commissioner determines, "based on a 'residual functional capacity' assessment, whether the claimant can perform any of his or her past relevant work despite the impairment." *Id.*

Finally, if the claimant is unable to perform past work, the Commissioner determines "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden of proving her case at steps one through four. *McIntyre*, 758 F.3d at 150. At step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Employing that sequential analysis in his September 19, 2016 decision, ALJ Menard first determined that Plaintiff has not engaged in substantial gainful activity since December 15,

2014, the alleged onset date. (AR 26.) At step two, the ALJ found that Plaintiff's severe

impairments are fibromyalgia syndrome, IBS, a mood disorder, and an anxiety disorder.

(AR 27.) The ALJ also found that Plaintiff has other non-severe impairments, including

tachycardia and headaches. (AR 28–29.) At step three, the ALJ concluded that Plaintiff does

not have an impairment or combination of impairments that meets or medically equals the

severity of one of the listed impairments. (AR 29.)

Next, the ALJ concluded that Plaintiff has the residual functional capacity (RFC) to

perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b)[1] except as follows:

> [S]he can understand, remember and carry out simple, routine tasks. She can
> occasionally interact with supervisors, co-workers and the public. She can deal
> with only few changes in a routine work setting with predictable routines. She
> requires ready access to bathroom facilities. She is limited from pushing/pulling
> more than 20 pounds occasionally and 10 pounds frequently.

(AR 30.) At step four, the ALJ concluded that Plaintiff is unable to perform any past relevant

work. (AR 33.) At step five, the ALJ considered Plaintiff's age, education, work experience,

and RFC, and concluded that there are jobs that exist in significant numbers in the national

economy that Plaintiff could perform, including mail clerk, assembler plastic hospital products,

and fruit distributor (packing). (AR 34.) The ALJ accordingly concluded that Plaintiff has not

---

[1] The regulations define light work as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls. To be considered capable of performing a full or
wide range of light work, you must have the ability to do substantially all of these
activities. If someone can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods of time.

been under a disability, as defined in the Social Security Act, from December 15, 2014 through the date of the decision. (AR 35.)

## Standard of Review

The Social Security Act defines disability, in pertinent part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the Act, a claimant will only be found disabled if his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In considering the Commissioner's disability decision, the court conducts "a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also* 42 U.S.C. § 405(g). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Poupore*, 566 F.3d at 305 (quoting *Consol. Edison Co. of N.Y. v. Nat'l Labor Relations Bd.*, 305 U.S. 197, 229 (1938)). The "substantial evidence" standard is even more deferential than the "clearly erroneous" standard; facts found by the ALJ can be rejected "only if a reasonable factfinder would *have to conclude otherwise.*" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)). The court is mindful that the Social Security Act is "a remedial

statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

**Analysis**

On appeal, Plaintiff argues that the ALJ failed to properly assess her physical limitations associated with fibromyalgia and IBS, and that evidence added to the record by the Appeals Council after the ALJ's decision shows greater mental limitations than the limitations in the RFC. (Doc. 12 at 1, 15.) The Commissioner maintains that the ALJ's decision is supported by substantial evidence and complies with applicable legal standards. (Doc. 15 at 1.)

**I.    Physical Limitations—Fibromyalgia**

**A.    Step-Three Analysis and Listing 14.09**

According to Plaintiff, the "primary problem" with the ALJ's RFC analysis is that the ALJ focused almost entirely on Listing 14.09 and failed to consider the factors in Social Security Ruling 12-2p, 2012 WL 3104869 (July 25, 2012) ("SSR 12-p"), or otherwise conduct a meaningful assessment of her pain symptoms. (*See* Doc. 12 at 3, 6.) The court accordingly reviews the ALJ's step-three analysis of Plaintiff's fibromyalgia syndrome.

Having found Plaintiff's fibromyalgia to be a "severe" impairment at step two, the ALJ discussed that impairment at step three to determine whether it meets or medically equals the criteria of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ wrote:

> Appendix 1 does not contain a listing for Fibromyalgia Syndrome. However, Social Security Ruling 12-2p establishes that it is appropriate to consider this condition under Listing 14.09 of Appendix 1. This listing describe[s] inflammatory arthritis. It establishes that an individual is disabled based upon the medical evidence alone if, in relevant part, she has persistent inflammation or joint deformity resulting in an inability to ambulate effectively or to perform fine and gross movements effectively. The inability to ambulate effectively means extreme limitation of the ability to ambulate. It is generally defined as having insufficient lower extremity strength to ambulate without the use of an assistive device that affects the use of both upper extremities. The inability to perform fine

and gross movements effectively also means extreme limitation of function. It is generally defined as having the inability to perform such tasks as preparing a simple meal and feeding oneself.

In this case, the claimant has consistently maintained normal gait (Exhibit B-1F/33). She does not use an assistive device to ambulate. She has also acknowledged that she engages in activities such as driving, drawing and doing arts and crafts (Exhibit B-11F/10, B-8F/43). Therefore, she is not unable to ambulate or to perform fine and gross movements effectively as contemplated by Listing 14.09 of Appendix 1.

(AR 29.) On appeal, Plaintiff does not argue that her fibromyalgia meets or medically equals the criteria of Listing 14.09. (Doc. 12 at 7.) Instead, she argues that the ALJ improperly limited the RFC assessment to the criteria of Listing 14.09, rather than considering the full set of factors outlined in SSR 12-2p. (*Id.* at 6; *see also* Doc. 21 at 1–2.) To assess that argument, the court turns to the ALJ's RFC analysis.

## B.   RFC Assessment Encompassed Fibromyalgia Symptoms

According to Plaintiff, the ALJ's discussion in support of the RFC is "extremely brief" and "did not even mention fibromyalgia or the effects of [Plaintiff's] severe pain that results from the disorder." (Doc. 12 at 3.) The Commissioner disagrees, arguing that the ALJ undertook "an extensive analysis of [Plaintiff's] subjective complaints of pain and clinical findings concerning her fibromyalgia throughout his decision." (Doc. 15 at 5.) Plaintiff maintains that the Commissioner "downplay[ed]" the severity of her symptoms. (Doc. 21 at 2.)

It is true that the ALJ's RFC discussion explicitly mentions "fibromyalgia" only twice (AR 31), and does not mention SSR 12-2p at all. But the ALJ began his RFC analysis by stating the he had carefully considered the entire record and had considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 96-4p." (AR 30–31.) This is consistent with SSR 12-2p, which states that the

RFC assessment must be based on "all relevant evidence in the case record" and that consideration must be given to "the effects of all of the person's medically determinable impairments, including impairments that are 'not severe.'" SSR 12-2p, at *6.

The ALJ then noted that he was required to follow a two-step process to evaluate Plaintiff's symptoms. (AR 31.) This is also consistent with SSR 12-2p, which requires the same two-step process. SSR 12-2p, at *5. First, the ALJ must determine whether there are "medical signs and findings" that show the claimant has a medically determinable impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* Second, once a medically determinable impairment is established, the ALJ must "evaluate the intensity and persistence of the person's pain or any other symptoms and determine the extent to which the symptoms limit the person's capacity for work." *Id.*

After summarizing Plaintiff's statements about her impairments (including fibromyalgia and medications tried for that impairment), the ALJ wrote:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(AR 31.) If the ALJ had stopped there, then the court might agree with Plaintiff that the analysis was insufficient. *See Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (ALJ must set forth the "crucial factors . . . with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence"). But the ALJ went on to discuss Plaintiff's daily activities, finding them "inconsistent with her assertion of disabling symptoms," and then reviewed opinion evidence. (AR 32–33.)

The court accordingly rejects Plaintiff's suggestion that the ALJ's "entire assessment" of her fibromyalgia appeared in the step-three analysis or was limited to considering the criteria of Listing 14.09. (Doc. 12 at 6.) The ALJ plainly had Plaintiff's fibromyalgia in mind in the RFC analysis. He explicitly mentioned fibromyalgia twice in his recitation of Plaintiff's statements (AR 31), and also mentioned Plaintiff's pain in his analysis of the opinion evidence (AR 33).

The court proceeds to consider Plaintiff's related argument that the ALJ's fibromyalgia analysis was deficient. Plaintiff argues that the ALJ failed to consider the factors enumerated in the regulations. (Doc. 12 at 5.) She also argues that the ALJ erroneously "reject[ed]" opinion evidence from her treating sources. (*Id.* at 7.) The court considers these arguments in turn.

### C. Enumerated Factors for Evaluation of Fibromyalgia Symptoms

The ALJ stated that he considered all of Plaintiff's symptoms based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929—regulatory provisions describing how to evaluate symptoms including pain. (AR 31.) Plaintiff argues that the ALJ failed to properly assess her symptoms under § 404.1529. (Doc. 12 at 5.)[2] A brief review of those relevant regulations is therefore warranted.

Sections 404.1529 and 416.929 instruct that, when evaluating the intensity and persistence of a claimant's symptoms, ALJs must "consider all of the available evidence, including your [the claimant's] history, the signs and laboratory findings, and statements from you, your treating or nontreating source, or other persons about how your symptoms affect you."

---

[2] Section 404.1529 is substantially similar to § 416.929; the main difference is that the former relates to DIB claims and the latter relates to SSI claims. Since this appeal concerns both types of claims, the court cites both provisions. Sections 404.1529 and 416.929 have been revised effective March 27, 2017. *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The court cites and applies the regulations that were in effect at the time of the ALJ's decision.

20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).[3] ALJs are also required to consider medical

opinions. *Id.* The regulations further require consideration of a series of factors relevant to the

claimant's symptoms:

> (i) Your daily activities;
>
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Importantly, the fact that ALJs are required to consider these enumerated factors does not

mean that ALJs must write about each one in every decision. Social Security Ruling 16-3p

specifically provides that adjudicators "will discuss the factors pertinent to the evidence of

record" but that "[i]f there is no information in the evidence of record regarding one of the

factors, we will not discuss that specific factor in the determination or decision because it is not

relevant to the case." SSR 16-3p, 2016 WL 1119029, at *7 (Mar. 16, 2016); *see also Oliphant v.*

*Astrue*, 2012 WL 3541820, at *22 (E.D.N.Y. Aug. 14, 2012) (ALJs are not required to

---

[3] This evaluation of symptoms was previously called a "credibility" assessment. The regulations and sub-regulatory policy no longer use the term "credibility," since "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016).

"explicitly address" each of these seven factors; the factors are "examples of alternative evidence that may be useful," but are not intended to be a "rigid, seven-step prerequisite to the ALJ's finding" (quoting *Snyder v. Barnhart*, 323 F. Supp. 2d 542, 546 (S.D.N.Y. 2004))).

Here, the ALJ did not write extensively on all of the seven factors. But the ALJ's discussion does suggest that he considered each factor. As to factor (i), the ALJ did write about Plaintiff's daily activities. (AR 32.) The court discusses that factor in greater detail below.

Relevant to factor (ii), the ALJ recited Plaintiff's complaints of pain in her back and neck and numbness in her hands. (AR 31.) As to factor (iii), the ALJ wrote that Plaintiff feels that her problems have become worse since the illness and loss of her parents, and also noted Plaintiff's statements about difficulties standing and sitting. (*Id.*) Relevant to factor (iv), the ALJ noted that Plaintiff has tried medication for her fibromyalgia,[4] and that she has side-effects (tremors) from her medications. (AR 31.) The ALJ also discussed the opinions of medical providers who treated Plaintiff for fibromyalgia symptoms, relevant to factor (v). (*See* AR 32–33.)[5] And with respect to factor (vi), the ALJ mentioned that Plaintiff alternates postures to relieve the pain. (AR 31.)

### D.      Daily Activities

According to the ALJ, Plaintiff's daily activities are "inconsistent with her assertion of disabling symptoms, as she has remained quite active with a wide variety of activities." (AR 31.) The ALJ stated that Plaintiff "gardens every day. She reads. She also participates in arts and crafts tasks such as crocheting and drawing." (*Id.*) Earlier in his opinion the ALJ noted

---

[4] This is consistent with Plaintiff's testimony that she had tried "a whole list" of medications for her fibromyalgia. (AR 859.)

[5] The ALJ also mentioned that Plaintiff does "exercises," which help "a little" for her fibromyalgia symptoms. This is relevant to factor (v), since Plaintiff testified that her doctors asked her to do exercises as part of her treatment. (AR 859.)

11

that Plaintiff "engages in activities such as driving, drawing and doing arts and crafts," and is also "able to shop for groceries." (AR 29; *see also* AR 30.) Later in his opinion, the ALJ again noted that Plaintiff did drawing and arts and crafts. (AR 33.) The ALJ also remarked that Plaintiff cared for a toddler-aged grandchild, and had started a "walking program." (*Id.*)

The court rejects Plaintiff's assertion that her level of activity has "no relevance" to fibromyalgia. (Doc. 21 at 3.) It is true that fibromyalgia is a disorder characterized by widespread pain and that no objective test can conclusively confirm the disease. *See Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003) ("[I]n stark contrast to the unremitting pain of which fibrositis patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." (quoting *Lisa v. Sec. of Dep't of Health & Human Servs.*, 940 F.2d 40, 45 (2d Cir. 1991))).[6] But unlike the ALJ in *Green-Younger*, ALJ Menard's determinations did not "turn[] on a perceived lack of objective evidence." *Id.* at 108. Rather, the ALJ undertook an evaluation of Plaintiff's symptoms, considering the factors listed above and other relevant evidence discussed below. Part of that evaluation includes review of daily activities, which, as the regulations recognize, can be relevant to a determination about the intensity and persistence of symptoms. *See Calabrese v. Astrue*, 358 F. App'x 274, 278 (2d Cir. 2009) (summary order) (ALJ assessing credibility must consider daily activities).

Here, substantial evidence supports the ALJ's remarks concerning Plaintiff's daily activities. She testified that her favorite hobby is gardening, which she does for up to a half hour a day. (AR 866.) She also testified that she reads, draws, colors, and does crochet. (AR 865.) She is able to drive. (AR 846.) She reported shopping in stores two to three times per month.

---

[6] Fibrositis is a term that was previously used to describe the syndrome now known as fibromyalgia. *Stedman's Medical Dictionary* 332340 (28th ed. 2006) (Westlaw).

(AR 1090.) Treatment notes from 2015 indicate that she was caring for her three-year-old grandson while the child's mother was at work. (AR 1200, 1372.) She testified that, with her doctors' encouragement, she walks every day for about 15 minutes. (AR 865–66.)

The court is mindful that "'a claimant need not be an invalid to be found disabled' under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988)); *see also Menard v. Astrue*, No. 2:11-CV-42, 2012 WL 703871, at *6 (D. Vt. Feb. 14, 2012) ("A claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job." (quoting *Polidoro v. Apfel*, No. 98 CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999)), *report and recommendation adopted*, 2012 WL 704376 (D. Vt. Mar. 5, 2012))). In this case, Plaintiff did testify to difficulties with some of her activities; for example, she stated that she could never do a whole sink of dishes, and that she does not garden alone because she sometimes cannot get up off the ground. But in general, substantial evidence supports the ALJ's conclusion about Plaintiff's daily activities. Her activities—especially including gardening, crafting, walking, and caring for her grandson—all lend support to the ALJ's determination.

### E.    Opinion Evidence

Consistent with the requirements of 20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1), the ALJ also considered the opinion evidence in the record. (AR 32–33.) Plaintiff argues that the ALJ "erred in rejecting the evidence from [her] treating sources" and assigned improper weight to other medical opinions. (Doc. 12 at 7–8.) The Commissioner maintains that the ALJ did not "reject" any opinion, and properly assessed all of the opinions. (Doc. 15 at 8–12.) Plaintiff

replies that there is no difference between "rejecting" an opinion and giving it "little weight," and maintains that the ALJ improperly assessed the weights given to medical opinions. (Doc. 21 at 5.)

### 1. ALJ Sutker's December 3, 2014 Decision[7]

ALJ Menard began his review of the opinion evidence by affording "partial weight" to the unappealed unfavorable December 3, 2014 decision of ALJ Dory Sutker (AR 952–63) regarding Plaintiff's 2013 applications for DIB and SSI benefits. (AR 32.) ALJ Sutker had determined that Plaintiff had the RFC to perform light work except as follows:

> She is unable to climb ladders, ropes and scaffolds, and is able to occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs. She is able to perform uncomplicated tasks (defined as those typically learned in 30 days or less), but in an environment without strict production quotas, (such as those on a factory line), or timed tasks. She is able to have occasional brief and superficial interactions with the general public, and she is able to collaborate with coworkers and supervisors on routine matters. She would miss one workday each month due to her impairments.

(AR 957–58.) ALJ Menard noted that ALJ Sutker is a non-medical source and her decision is remote in time. (AR 32.) But the ALJ stated that "despite the claimant's allegation that she has been disabled since 12 days after the issuance of this decision, she offered no evidence of any intervening event that altered her functioning." (*Id.*)

Plaintiff asserts that a prior ALJ decision is not opinion "evidence." (Doc. 21 at 2.)[8] Plaintiff is correct that a prior ALJ decision is not a "medical opinion or other evidence to be weighed on the evidentiary scale." *Evaline M. v. Comm'r of Soc. Sec.*, No. 2:18-cv-33, 2018 WL

---

[7] The court discusses ALJ Sutker's decision as it relates to physical limitations here. The court returns to ALJ Sutker's decision below in discussing Plaintiff's mental limitations.

[8] Plaintiff raises this argument for the first time in her reply memorandum. "Generally, courts do not consider arguments raised for the first time in a reply brief." *Montanio v. Keurig Green Mountain, Inc.*, 276 F. Supp. 3d 212, 223 (D. Vt. 2017). The court has elected to consider this issue as part of its plenary review in this case.

4771903, at *4 (D. Vt. Oct. 3, 2018). For purposes of a disability evaluation, assigning evidentiary weight to a prior ALJ decision is error. *See id.* The court accordingly considers whether the error is harmless. *See id.* (considering whether erroneous treatment of prior ALJ decision as an opinion was harmless).[9]

Plaintiff argues that because her onset date was only 12 days after ALJ Sutker's decision, it is "unlikely that [her] condition had improved in the interval." (Doc. 21 at 2.) She maintains that ALJ Menard erroneously failed to adopt several of ALJ Sutker's limitations. (*Id.*) As relevant to physical functioning, Plaintiff asserts that ALJ Menard should have adopted the 2014 RFC's acknowledgement that Plaintiff would miss one day of work per month, as well as the limitation to "occasional" balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs. (*Id.*)

Plaintiff does not articulate how ALJ Menard's failure to include those particular limitations would affect the outcome in this case. Indeed, the VE testified that one unexcused absence per month is typically tolerated. (AR 874.) The VE also testified that an individual with similar (and in fact slightly more restrictive) limitations on ramps stairs, balancing, stooping, kneeling, crouching, and crawling—as well as psychological limitations similar to those posed in the RFC—could perform work as a surveillance system monitor. (AR 871–74.)

---

[9] As Plaintiff points out, a prior ALJ opinion can have preclusive effect under certain circumstances. At least in situations where ALJ decisions adjudicate overlapping time periods, preclusion principles "would dictate that the later decision be bound by the earlier one, unless there is evidence that the impairment improved." *Evaline M.*, 2018 WL 4771903, at *4. Here, the period that ALJ Sutker reviewed (December 30, 2011 through December 3, 2014) does not overlap with the period that ALJ Menard reviewed (December 15, 2014 through September 19, 2016). The case for applying a preclusion doctrine in this case is therefore weakened. *See Evaline M.*, 2018 WL 4771903, at *4 ("When a plaintiff's claim involves a different unadjudicated time period, an ALJ is not bound by a prior ALJ's findings." (quoting *Wessel v. Colvin*, No. 3:14CV00184 (AVC), 2015 WL 12712297, at *4 (D. Conn. Dec. 30, 2015))).

The functional area that Plaintiff does discuss is reaching. (*See* Doc. 12 at 10–13.) On that issue, Plaintiff's argument about ALJ Sutker's decision seems to undermine her position. If Plaintiff's condition did not change between December 3 and 15, 2014, then presumably her RFC did not change in that span of time, either. But ALJ Sutker's RFC included no limitation on reaching. The court discusses reaching in additional detail below. For present purposes, it is sufficient to conclude that ALJ Menard's assignment of evidentiary weight to ALJ Sutker's prior decision was harmless error.

### 2. Nurse Practitioner Boardman and Dr. Connolly

Nurse Practitioner (NP) Maureen Boardman of Little Rivers Health Care (LRHC) was treating Plaintiff for fibromyalgia before the alleged onset date. At an October 27, 2014 appointment, Plaintiff reported to NP Boardman that her fibromyalgia was "acting up." (AR 1216.) Her medications at that time included OxyContin for pain care as well as Lyrica. She reported that her pain was better with the Lyrica, but she also reported "significant pain in her hips and legs bilaterally." (AR 1217.) NP Boardman increased the dose of Lyrica and advised Plaintiff to return for a follow-up in six weeks. (AR 1216.) NP Boardman continued treating Plaintiff for fibromyalgia and other conditions at multiple appointments in 2015.

NP Boardman completed and signed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on September 11, 2015. (AR 1291–94.) LRHC physician Dr. Kevin Connolly co-signed the statement on the same date. (*See* AR 1294.) Regarding exertional limitations, the statement indicates that Plaintiff can occasionally lift or carry 10 pounds; frequently lift or carry less than 10 pounds; and can stand or walk "at least 2 hours in an 8-hour workday." (AR 1291.) As to manipulative limitations, NP Boardman opined that Plaintiff is unlimited in handling, fingering, and feeling, but that she is limited to reaching for

"less than 2 ½ hours a day." (AR 1292.) In response to a question asking what medical or clinical findings support that conclusion, NP Boardman wrote: "While I believe there are significant limitations to her ability to reach in all directions especially overhead secondary to her fibromyalgia I am unaware of any issues with handling, fingering and feeling." (*Id.*)

NP Boardman further opined that Plaintiff is limited in sitting because she must periodically alternate sitting and standing to relieve pain or discomfort. (AR 1293.) She also wrote that Plaintiff is limited in both her upper and lower extremities with respect to pushing or pulling. In support, NP Boardman wrote: "Patient's significant and well documented history of chronic muscle pain related to her fibromyalgia." (*Id.*) Regarding postural limitations, NP Boardman indicated that Plaintiff could "never" kneel or crawl, and could "occasionally" climb, balance, crouch, and stoop. (*Id.*) She explained: "Patient is capable of climbing ramps and stairs occasionally. Not capable of climbing a ladder/rope or scaffold secondary to her fibromyalgia pain." (*Id.*)

ALJ Menard assigned "little weight" to NP Boardman and Dr. Connolly's opinion. (AR 32.) According to the ALJ:

> A review of the medical evidence fails to establish that Dr. Connolly even evaluated the claimant during the period at issue. Rather, the document appears to have been drafted by Nurse Practitioner Boardman and merely co-signed by Dr. Connolly. Moreover, it is noted that Nurse Practitioner Boardman is not a medically acceptable source within the meaning of the Social Security Act (20 C.F.R. 404.1513 and 416.913). Further, the limitations assessed are not supported by Nurse Practitioner Boardman's clinical observations or by any objective testing.

(AR 32–33.) Plaintiff asserts that all of the ALJ's reasons for the weight given are "unacceptable." (Doc. 12 at 7.)

17

The court begins with Plaintiff's argument that Dr. Connolly was entitled to "treating physician status." (Doc. 12 at 7.)[10] The court has no difficulty concluding that, since Dr. Connolly signed the September 11, 2015 statement, that statement constitutes his opinion as well as NP Boardman's opinion. *See Waters v. Astrue*, No. 5:10-CV-110, 2011 WL 1884002, at *8 n.5 (D. Vt. May 17, 2011) ("Cases have held that when a doctor and a physician's assistant sign the same reports, 'the opinions [are] those of [the treating physician] as well as those of [the physician's assistant.].'" (alterations in original) (quoting *Riechl v. Barnhart*, No. 02-CV-6169 CJS, 2003 WL 21730126, at *11 (W.D.N.Y. June 3, 2003))). But with no evidence that Dr. Connolly personally treated Plaintiff during the relevant time period, Dr. Connolly's opinion could not qualify for the extra weight accorded to the opinion of a treating source. *See Wortman v. Berryhill*, No. 5:16-cv-220, 2017 WL 3911033, at *6 (D. Vt. Sept. 5, 2017) (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983)) (opinion of psychiatrist who co-signed treating therapist's mental RFC statement did not qualify for treating-physician status because psychiatrist saw the claimant only twice); *Malave v. Berryhill*, No. 3:16CV00661(SALM), 2017 WL 1080911, at *6 (D. Conn. Mar. 22, 2017) (absent any evidence that co-signing psychologist ever met with the plaintiff, psychologist's opinion was not entitled to treating-physician status).

The out-of-circuit cases that Plaintiff cites are unpersuasive. In *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1039 (9th Cir. 2003), the court held that, despite only meeting the claimant once, the psychiatrist who led the claimant's treatment team and oversaw her care was a "treating physician." The court suggested that the ALJ should have considered whether the

---

[10] As described in greater detail below, the treating-physician rule "generally requires a measure of deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam).

psychiatrist saw the claimant "with a frequency consistent with accepted medical practice for this type of treatment" as well as the evidence of the psychiatrist's "ongoing prescription and medication management of [the claimant's] psychiatric evaluations and regular consultations with her therapists." *Id.* Unlike in *Benton*, there is no evidence that during the relevant time period Dr. Connolly met with Plaintiff even once, nor is there evidence that he was involved in ongoing medication management or regular consultations with treatment team members.[11] The court accordingly rejects Plaintiff's argument that Dr. Connolly was entitled to "treating physician status."

Plaintiff does not dispute the ALJ's conclusion that NP Boardman is not an "acceptable medical source" under 20 C.F.R. §§ 404.1513 and 416.913.[12] But Plaintiff asserts that the ALJ "ignored" SSR 06-03p. (Doc. 12 at 7.) The court disagrees. The ALJ specifically cited SSR 06-03p. (AR 31.) Moreover, SSR 06-03p simply confirms that the opinions of medical sources who are not "acceptable medical sources" are nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006). As to whether the ALJ complied with that instruction, the court considers the remainder of the ALJ's analysis of NP Boardman's opinion.

---

[11] *Benton* is not only distinguishable on its facts, but at least one other court in this circuit has stated that *Benton* is "directly at odds with controlling precedent in this Circuit." *Malave*, 2017 WL 1080911, at *6 n.5. The court has considered the remaining out-of-circuit cases cited by Plaintiff on this point and finds them unpersuasive.

[12] Sections 404.1513 and 416.913 have been revised effective March 27, 2017. *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). The court cites and applies the regulations that were in effect at the time of the ALJ's decision.

The ALJ found that the limitations that NP Boardman assessed "are not supported by [her] clinical observations or by any objective testing." (AR 32–33.) The court's review of the record confirms that clinical observations and objective testing are consistent with Plaintiff's fibromyalgia diagnosis, but are largely silent regarding specific relevant functional limitations. The ALJ summarized progress notes indicating subjective complaints of pain as well as treatment for that pain with medications. (*See* AR 27, 33.)

The ALJ's summary is accurate. Musculoskeletal examination showed normal gait, range of motion, and muscle strength on November 10, 2014. (*See* AR 1219–22.) Apart from notations of pain, other musculoskeletal examinations were generally unremarkable, with no indications of any particular functional limitations except as otherwise noted below. (*See* AR 1197, 1200, 1209, 1217, 1372.)

Plaintiff stated that Lyrica seemed to be working at her October 27, 2014 appointment. (AR 1216.) At a November 10, 2014 appointment for pain management, her provider decided to taper her off of OxyContin because Plaintiff was using marijuana for pain relief. (AR 1219.) Plaintiff met NP Boardman for a medication check on January 10, 2015. (AR 1208.) Plaintiff complained of muscle aches and pain. (AR 1209.) She had been able to come off of the narcotics. (*Id.*) Plaintiff was "[t]hinking about going back to work," and NP Boardman noted that Plaintiff should continue with her current treatment plan for fibromyalgia. (AR 1208.)

At an appointment on March 17, 2015, Plaintiff complained of worsening fibromyalgia symptoms, which NP Boardman noted were "probably secondary to all her recent stressors with the upheav[a]l in the household." (AR 1199.) Plaintiff stated that she wanted to work through the issues without increasing medications. (*Id.*) Plaintiff reported having more pain at an April 30, 2015 appointment. (AR 1196.) NP Boardman restarted her on tramadol. (*Id.*)

Plaintiff and NP Boardman discussed paperwork for disability on August 6, 2015. (AR 1370.) Plaintiff was to continue with her treatment plan for fibromyalgia. (*Id.*)

At an October 5, 2015 appointment, Plaintiff continued to complain of "significant muscle aches and pain related to her fibromyalgia." (AR 1368.) As before, NP Boardman instructed Plaintiff to continue with her treatment plan for fibromyalgia. (AR 1367.) Plaintiff did have decreased range of motion in her left foot and ankle at that time, but that was due to a sprain. (*See* AR 1367–69.) Plaintiff discussed fibromyalgia with NP Boardman at a December 17, 2015 appointment. (AR 1362.) The discussion focused on the relationship between fibromyalgia and stress, and NP Boardman noted that the stress was "better for now." (*Id.*) The plan was to continue current treatment. (*Id.*)

Plaintiff complained of muscle aches at a May 13, 2016 appointment. (AR 1358.) NP Boardman noted that Plaintiff was "trying to pace her activity level and walk on a daily basis." (AR 1357.) Plaintiff was to continue her treatment plan for fibromyalgia. (*Id.*) NP Boardman did note that Plaintiff moved "with some difficulty" around the examination room, although it is unclear whether that was related to the sprained left foot. (*See* AR 1359.)

Plaintiff's pain is well documented, but is not by itself sufficient to establish disability. *See Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983) ("[D]isability requires more than mere inability to work without pain."). Plaintiff does not cite any medical records containing more specific limitations on functioning due to fibromyalgia. But she does fault the ALJ for not addressing her alleged "reaching" limitations specifically. (Doc. 12 at 10.) The Commissioner maintains that the ALJ is not required to discuss every piece of the evidence in the record, and that the ALJ's general observation that the evidence was inconsistent with NP Boardman's findings is equally applicable to "reaching" in particular. (Doc. 15 at 9.)

The court agrees with the Commissioner on this point. As with the other relevant functional areas, NP Boardman's restrictive opinion regarding "reaching" is unsupported by clinical observations or objective testing. Notably, when asked to supply medical or clinical findings for her conclusions about Plaintiff's functioning, NP Boardman supplied only general statements regarding Plaintiff's history of pain related to fibromyalgia. Applying the proper analysis, the ALJ was not required to credit Plaintiff's testimony about reaching (AR 863) or to conclude that any such issues required a specific limitation in the RFC.

Of course, as discussed above, an ALJ evaluating fibromyalgia may err if all of his or her determinations turn on a "perceived lack of objective evidence." *Green-Younger*, 335 F.3d at 108. Here, the ALJ noted a lack of objective test results. But the ALJ's determinations did not rest solely on that rationale. As described above, the ALJ reviewed the factors in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), and also specifically discussed Plaintiff's daily activities. The court is satisfied that the ALJ used the proper legal standards in analyzing Plaintiff's complaints of pain.

## II.     Physical Limitations—IBS

Although Plaintiff asserts that the "primary" problem with the ALJ's RFC analysis relates to his consideration of the effects of Plaintiff's fibromyalgia (Doc. 12 at 3), she also maintains that the ALJ failed to account for the limitations from her IBS (*id.* at 2).[13] She asserts that the ALJ improperly discredited the opinion of state agency reviewing physician Dr. Elizabeth White regarding frequency of bathroom use. (Doc. 12 at 14.) The Commissioner maintains that the

_____

[13] The court recognizes that fibromyalgia frequently occurs in conjunction with irritable bowel syndrome. *Stedman's Medical Dictionary* 331870 (28th ed. 2006) (Westlaw). Plaintiff makes this point to underscore her argument that the ALJ's analysis of her fibromyalgia was flawed. (*See* Doc. 12 at 4; Doc. 21 at 3.) The court rejects that argument for the reasons stated above, and discusses IBS separately here.

ALJ properly considered Plaintiff's IBS condition and properly analyzed Dr. White's opinion. (Doc. 15 at 7, 11.) In reply, Plaintiff asserts that the ALJ repeated the alleged error of focusing excessively on step-three listed impairments; she asserts that the ALJ incorrectly asserted that her IBS "could be assessed under listing 5.08 and then conclud[ed] that it did not meet that listing." (Doc. 21 at 1.)

### A.      Step-Three Analysis and Listing 5.08

As with fibromyalgia, the ALJ found Plaintiff's IBS to be a "severe" impairment at step two, and then discussed that impairment at step three to determine whether it meets or medically equals the criteria of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. In his step three analysis, the ALJ wrote:

> Appendix 1 does not contain a specific listing for irritable bowel syndrome. However, Listing 5.08 establishes any digestive disorder is disabling based upon the medical evidence alone if the claimant has weight loss with a BMI of less than 17.50. In this case, the record does not show that the claimant has had any weight loss or nutritional compromise due to irritable bowel syndrome. Therefore, this condition does not meet or equal the severity of an impairment described in Appendix 1.

(AR 29.) Plaintiff does not argue that her IBS meets or equals the severity of a listed impairment, but she does assert that the ALJ "downplay[ed]" the severity of her IBS. (Doc. 21 at 2.) The court accordingly turns to her specific argument regarding the ALJ's analysis of Dr. White's opinion.

### B.      Dr. White

In an opinion dated July 24, 2015, Dr. White assessed Plaintiff's RFC and stated, among other things, that Plaintiff's workplace "should allow frequent bathroom breaks as needed." (AR 926.) The ALJ gave Dr. White's opinion "partial weight." (AR 32.) Referring to Dr. White's statement about the need for "frequent" bathroom breaks, the ALJ wrote:

> [T]he term "frequent" as used in vocational terms means one-third to two-thirds of the time (See: POMS Section DI 25001.001). There is no dispute that an individual who had such limitations would be unable to sustain employment; however, the medical evidence does not support any such restriction. As noted, the claimant has acknowledged that she does not take any medication for this condition. Further, there is no evidence that the claimant has any significant related weight loss or nutritional compromise. In fact, there is little evidence at all regarding any signs or symptoms of gastrointestinal symptoms that occur with such frequency. Rather, the record does show that the claimant has reported intermittent symptoms of diarrhea for which a change in diet has been prescribed. Such symptoms are accommodated herein by requiring ready access to bathroom facilities.

(*Id.*) Consistent with that determination, the ALJ's RFC states that Plaintiff requires "ready access to bathroom facilities." (AR 30.)

Noting that no other physician contradicted Dr. White's statement about the need for "frequent" bathroom breaks, Plaintiff argues that the ALJ improperly substituted his own lay opinion for Dr. White's. (Doc. 12 at 14–15.) The Commissioner maintains that the ALJ properly found that the clinical evidence did not support a need for "frequent" bathroom breaks as that word is defined in vocational terms. (Doc. 15 at 11.)

Plaintiff correctly points out that an ALJ "is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (per curiam). But the ALJ did not do that in this case. Instead, the ALJ formulated the portion of the RFC related to Plaintiff's IBS symptoms by considering the medical evidence and the record as a whole. The ALJ properly articulated reasons for declining to adopt Dr. White's statement about the need for "frequent" bathroom breaks.

It is true that state agency medical consultants are "highly qualified" and are experts in Social Security disability evaluation. *Bertram v. Berryhill*, No. 2:17-cv-00033, 2018 WL 1010287, at *14 (D. Vt. Feb. 21, 2018) (quoting *Smith v. Colvin*, 17 F. Supp. 3d 260, 268

(W.D.N.Y. 2014)). Despite that expertise, ALJs are not required to give substantial weight to such opinions if they are not consistent with the record as a whole. *See id.* Here, even assuming that Dr. White used the term "frequent" in the vocational sense (meaning one-third to two-thirds of the time), the ALJ properly declined to give weight to that portion of the opinion. The court's review of the record confirms the ALJ's statement regarding the lack of evidence of gastrointestinal symptoms that occur with disabling frequency.

## III.  Mental Limitations

The ALJ found that Plaintiff has mood and anxiety disorders that constitute "severe" impairments. (AR 27.) After finding that the impairments do not meet or medically equal the criteria of the listings, the ALJ assessed an RFC with the mental and social limitations described above: limitations to "simple, routine tasks"; "occasional" interactions with supervisors, coworkers, and the public; and only "few changes" in a routine work setting. (AR 30.) Plaintiff argues that the RFC underrepresents the seriousness of her mental health condition because the ALJ failed to develop the record and erred in his analysis of Plaintiff's treating sources. (*See* Doc. 12 at 7–9.) The Commissioner maintains that the ALJ's review of the opinions of her mental health providers was proper, and that there were no gaps in the record that necessitated development of the record. (*See* Doc. 15 at 9–11.)

### A.  Treating Physician Rule

The treating-physician rule "generally requires a measure of deference to the medical opinion of a claimant's treating physician." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam); *see also* 20 C.F.R. §§ 404.1527, 416.927(c)(2) (2012).[14] Under the rule, "the

---

[14] Sections 404.1527 and 416.927 have been revised effective March 27, 2017. *See generally Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg.

opinion of a claimant's treating physician as to the nature and severity of the impairment is given

'controlling weight' so long as it 'is well-supported by medically-acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in

[the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original)

(quoting 20 C.F.R. § 404.1527(c)(2)).

Even when a treating physician's opinion is not given controlling weight, it is still

entitled to some weight because treating physicians are "likely to be the medical professionals

most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)

and may bring a unique perspective to the medical evidence." 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). If a treating physician's opinion is not given controlling weight, the weight to be

given the opinion depends on several factors: (1) the length of the treatment relationship and the

frequency of examination; (2) the nature and extent of the treatment relationship; (3) the relevant

evidence supporting the opinion; (4) the consistency of the opinion with the record as a whole;

(5) whether the opinion is of a specialist; and (6) other factors which tend to support or

contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6). The Commissioner

is required to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2). "Failure to provide 'good reasons' for not crediting the

opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128,

133 (2d Cir. 1999).

### B.     Dr. Wendling

Plaintiff's psychiatrist, Dr. Claire Wendling, is a treating physician for purposes of the

treating-physician rule. Dr. Wendling first treated Plaintiff at an appointment on February 24,

5844 (Jan. 18, 2017). Except as otherwise noted, the court cites and applies the pertinent
regulations that were in effect at the time of the ALJ's decision.

2015.  (AR 1239, 1314.)  She treated Plaintiff at follow-up visits on March 17 and May 14, 2015.

(AR 1245, 1247.)  Dr. Wendling completed a Mental Residual Functional Capacity

Questionnaire on June 11, 2015.  (AR 1314–18.)

In her June 11, 2015 opinion, Dr. Wendling's multiaxial evaluation indicates two clinical

disorders—depression NOS (not otherwise specified) and PTSD—and personality disorder NOS.

(AR 1314.)  She also indicated "severe" psychosocial and environmental problems, and a current

Global Assessment of Functioning (GAF) score of 50.  (*Id.*)  Dr. Wendling noted that Plaintiff

was being treated with psychotherapy and medications and that she is "stable but symptomatic."

(*Id.*)  When describing clinical findings that demonstrate the severity of Plaintiff's mental

impairment and symptoms, Dr. Wendling wrote: "Tearful, childlike presentation at times."  (*Id.*)

She indicated that Plaintiff's prognosis is "fair," but that Plaintiff is "likely to have chronic

symptoms."  (*Id.*)  Dr. Wendling checked fourteen signs and symptoms.  (AR 1315.)[15]

Evaluating the effects of Plaintiff's impairments on the mental abilities and aptitudes

needed to do unskilled work, Dr. Wendling opined that Plaintiff is "unable to meet competitive

standards" as to the ability to deal with normal work stress and to complete a normal workday

and workweek "without interruptions from psychologically based symptoms."  (AR 1316.)  She

opined that Plaintiff was "seriously limited, but not precluded" in her abilities to perform at a

consistent pace and to get along with co-workers or peers.  (*Id.*)  She opined that Plaintiff's

ability to respond appropriately to changes in a routine work setting is "limited but satisfactory."

---

[15] The signs and symptoms that Dr. Wendling checked are: thoughts of suicide; feelings
of guilt or worthlessness; impairment in impulse control; generalized persistent anxiety; mood
disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a
traumatic experience; pathological dependence, passivity or aggressivity; persistent disturbance
of mood or affect; intense and unstable interpersonal relationships and impulsive and damaging
behavior; motor tension; emotional lability; autonomic hyperactivity; and sleep disturbance.

(*Id.*) Responding to a question requesting explanation and findings in support, Dr. Wendling wrote: "Depression and anxiety would interfere with function in a work place." (*Id.*)

Regarding mental abilities and aptitudes needed to do semiskilled and skilled work, Dr. Wendling opined that Plaintiff is unable to meet competitive standards in dealing with the stress of such work. (AR 1317.) She explained that Plaintiff "gets anxious already despite very limited activities." (*Id.*) As to the mental abilities and aptitudes needed to do particular types of jobs, Dr. Wendling opined that Plaintiff's ability to maintain socially appropriate behavior is seriously limited but not precluded. (*Id.*) She also stated that Plaintiff's ability to interact appropriately with the general public is limited but satisfactory. (*Id.*) Dr. Wendling explained: "I think she would be panicky and fearful much of the time." (*Id.*)

ALJ Menard gave Dr. Wendling's opinion "little weight." (AR 33.) He reasoned that Dr. Wendling's opinion "is based upon only three visits." He also stated that Dr. Wendling provided "minimal clinical evidence to support the limitations assessed." Citing records from the February 2015 appointment and a September 2015 appointment, the ALJ found that "[s]uch evidence fails to establish that Dr. Wendling's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques." The ALJ further stated that Dr. Wendling's opinion is "inconsistent with the other substantial evidence of record including the opinions of State Agency Reviewing psychologists Dr. Hurley and Dr. Reilly." The ALJ concluded that Dr. Wendling's opinion should receive little weight "because of the limited number of visits, the minimal clinical findings and the contradictions between the limitations opined and the claimant's daily activities." (*Id.*)

The opinion of a treating physician is not afforded controlling weight where it is "not consistent with other substantial evidence in the record, such as the opinions of other medical

experts." *Halloran*, 362 F.3d at 32. Here, the June 24, 2015 opinion of Dr. Edward Hurley (AR 908–10) and the July 24, 2015 opinion of Dr. Thomas Reilly (AR 926–28) are both substantially less restrictive than Dr. Wendling's June 11, 2015 opinion. Whereas Dr. Wendling assessed "serious" or greater limitations in completing a normal work day and performing at a consistent pace, Dr. Hurley and Dr. Reilly opined that Plaintiff is only "moderately" limited in those areas. (AR 909, 927.) They explained:

> Limited for complex tasks and high-production-norm tasks. Episodic mood and anxiety problems and pain can temporarily undermine cognitive efficiency. Otherwise, with social limitations, [Plaintiff] can sustain CPP [concentration, persistence, and pace] over two-hour periods through a typical workday/work week for simple 1- to 3-step tasks.

(AR 909, 927.)

And in contrast to Dr. Wendling's restrictive opinion about Plaintiff's abilities to get along with co-workers and peers and to deal with normal work stress, Dr. Hurley and Dr. Reilly both opined that Plaintiff is not significantly limited with respect to the former, and that she has no more than "moderate" adaptation limitations. (AR 910, 927–28.) Dr. Hurley and Dr. Reilly did note that Plaintiff "would perform best in an environment with predictable routines and minimum of stresses." (AR 910, 928.) The ALJ gave "great weight" to Dr. Hurley and Dr. Reilly's opinions, noting that their opinions are within the areas of their expertise and that they both "supported their opinions with detailed explanations consistent with [the] medical record." (AR 32.)

Plaintiff acknowledges that a non-treating medical expert's opinion can override a treating physician's opinion, but argues that the ALJ failed to demonstrate why Dr. Hurley and Dr. Reilly's opinions are sufficiently substantial to undermine Dr. Wendling's opinion. (Doc. 12 at 8.) Of course, "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Burgess*, 537 F.3d at 128.

29

Plaintiff asserts that Dr. Hurley and Dr. Reilly's opinions should receive little weight because they "had not seen much of the evidence." (Doc. 12 at 8.)

The court rejects that argument. Dr. Hurley and Dr. Reilly issued their opinions only a few weeks after Dr. Wendling's June 11, 2015 opinion; all three doctors reviewed the relevant psychological evidence available at the time. There are some additional mental health records after mid-2015, but there is no basis to conclude that Dr. Hurley or Dr. Reilly's opinions are superseded by the additional material in the record. *See Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order) (stating that there is no "unqualified rule that a medical opinion is superseded by additional material in the record").[16]

To override the opinion of a treating physician, the ALJ must consider the factors listed above and give "good reasons" for the weight given. *Greek*, 802 F.3d at 375. The court concludes that the ALJ gave good reasons for assigning little weight to Dr. Wendling's opinion. The ALJ noted that Dr. Wendling met with Plaintiff only three times before rendering her June 11, 2015 opinion. The ALJ also found "contradictions" between the limitations that Dr. Wendling assessed and Plaintiff's daily activities. (AR 33.) Plaintiff's daily activities— discussed above and noted by Dr. Wendling in a September 22, 2015 treatment note (AR 1429)—are in some tension with Dr. Wendling's restrictive opinion.

Perhaps most importantly, the ALJ found that Dr. Wendling provided "minimal clinical evidence" to support the limitations that she assessed. (AR 33.) Substantial evidence supports that conclusion. Dr. Wendling's responses to the mental RFC questionnaire's questions asking

---

[16] None of the three doctors reviewed the records or opinion of Tracy Thompson, LICSW, since Ms. Thompson did not begin treating Plaintiff until March 2016. The court discusses Ms. Thompson's opinion below. To the extent that Plaintiff's argument is that Dr. Hurley and Dr. Reilly did not see the evidence underlying ALJ Sutker's December 3, 2014 decision, the court addresses that issue below as well.

for explanations are general and conclusory. At the February 24, 2015 appointment, Dr. Wendling noted normal behavior and speech, adequate form of thought, and goal-directed thought content. (AR 1242.) She remarked that Plaintiff's concentration is mildly impaired, noting that Plaintiff "loses train of thought." (*Id.*) Social judgment is "mildly impaired." (AR 1243.) Dr. Wendling suspected that Plaintiff has an "underlying mixed personality disorder with significant dependent traits, given her [history of] interpersonal difficulties," but noted that Plaintiff had been able to compensate for her own neediness "by becoming a caregiver for others." (AR 1243.)

At the March 17, 2015 appointment, Dr. Wendling noted that Plaintiff presented as anxious and frustrated stemming from responsibilities for caring for a two-year-old child as a result of her decision to leave her marriage. (AR 1248.) But Dr. Wendling noted good speech, future-oriented thought content, and organized thought process. (*Id.*) At the May 14, 2015 appointment, Dr. Wendling observed that Plaintiff "still feels trapped in [a] bad situation." (AR 1246.) But she again noted good speech, future-oriented thought content, and organized thought process. (*Id.*)

The ALJ properly concluded that Dr. Wendling's treatment notes do not support the serious limitations that Dr. Wendling marked on the questionnaire. The records indicate anxiety and some social difficulties, but describe only mild impairments and reflect past successful coping mechanisms. For all of the above reasons, the court concludes that the ALJ gave sufficiently good reasons for assigning little weight to Dr. Wendling's opinion.

### C.    Ms. Thompson

Tracy Thompson, LICSW, began treating Plaintiff on March 4, 2016, and saw her on a weekly basis thereafter. (AR 1373.) Ms. Thompson completed a mental RFC questionnaire on

June 27, 2016. (AR 1373–77.) She noted diagnoses including depression, anxiety, and mood disorder. (AR 1373.) She listed Plaintiff's treatments and stated that Plaintiff was increasing the use of coping and calming skills, but that she "[c]ontinues to struggle with emotional responses at times." (*Id.*) She described clinical findings regarding severity of Plaintiff's mental impairment and symptoms as follows: "Client struggles with memory, word retrieval, attention as a result of depression and anxiety." (*Id.*) Ms. Thompson listed Plaintiff's prognosis as guarded. (*Id.*) She checked five signs and symptoms: decreased energy, feelings of guilt or worthlessness, difficulty thinking or concentrating, recurrent and intrusive recollections of a traumatic experience, and memory impairment. (AR 1374.)

Regarding mental abilities and aptitudes for unskilled work, Ms. Thompson opined that Plaintiff is unable to meet competitive standards in four areas: remembering work-like procedures, maintaining regular attendance, completing a normal workday and workweek, and performing at a consistent pace. (AR 1375.) She opined that Plaintiff is seriously limited in six areas: understanding and remembering short and simple instructions; carrying out short and simple instructions; maintaining attention for two-hour segments; working with others without being unduly distracted; making simple work-related decisions; and dealing with normal work stress. She noted limited but satisfactory abilities in five other areas. (*Id.*) She explained: "Client demonstrates difficulty in memory and recall in a low-risk clinical setting. Client would experience these difficulties as well as difficulty managing physical symptoms leading to inconsistent job ability." (*Id.*)

Regarding mental abilities and aptitudes for semiskilled and skilled work, Ms. Thompson indicated that Plaintiff is unable to meet competitive standards with respect to understanding, remembering, and carrying out detailed instructions, and with respect to dealing with the stress

of such work.  (AR 1376.)  She opined that Plaintiff is seriously limited in terms of setting

realistic goals or making plans independently of others.  (*Id.*)  She explained: "Client currently

lacks stamina to maintain mental and physical effort—instructions, plans must be written down

or they are forgotten."  (*Id.*)  Ms. Thompson wrote that she expected Plaintiff to be absent from

work due to impairments or treatment more than four days per month on average.  (AR 1377.)

The ALJ gave Ms. Thompson's opinion little weight.  (AR 33.)  He stated that

Ms. Thompson is not an acceptable medical source.  He also found that the limitations she

assessed "are not reflective of any related clinical signs."  (*Id.*)  "For instance," according to the

ALJ, "while this source opined that the claimant demonstrated difficulty with memory and recall,

there are no clinical observations in her treatment records establishing the presence of memory

difficulties."  (*Id.*)

As noted above, the opinions of medical sources who are not "acceptable medical

sources" are nevertheless "important and should be evaluated on key issues such as impairment

severity and functional effects, along with the other relevant evidence in the file."  SSR 06-03p,

2006 WL 2263437 (Aug. 9, 2006).  Ms. Thompson assessed numerous limitations in a variety of

areas of mental functioning; she assessed greater limitations than Dr. Wendling, Dr. Hurley and

Dr. Reilly in almost every functional area.  With that observation, the ALJ's notation that

Ms. Thompson was not an acceptable medical source perhaps gains some additional meaning.

The ALJ was highlighting the fact that Ms. Thompson's assessment of functioning was generally

inconsistent with the assessments of those acceptable medical sources who offered opinions.

In any case, the only specific explanation that Ms. Thompson gave for her restrictive

assessments was that Plaintiff "demonstrates difficulty in memory and recall."  (AR 1375.)  The

ALJ found that to be unsupported by any treatment records.  (AR 33.)  Plaintiff summarily

asserts that finding is "incorrect." (Doc. 12 at 9.) The court has reviewed Ms. Thompson's notes from approximately 15 appointments between March 4 and June 13, 2016, none of which include complaints of memory problems, and several of which actually mention discussions about Plaintiff's memories. (AR 1378–1414.) As the Commissioner points out, other earlier notations in the record indicate normal memory and good recall. (AR 1220, 1243.) Notably, Dr. Wendling did not check "memory impairment" in her list of signs and symptoms. (AR 1315.) The court finds no error in the ALJ's assessment of Ms. Thompson's opinion.

### D. Development of the Record

Plaintiff asserts that the failure to locate any clinical observations supporting difficulty with memory or recall is a "reflection of the ALJ's failure to adequately develop the record." (Doc. 12 at 9.) In particular, Plaintiff suggests that ALJ Menard should have obtained the record from Plaintiff's prior case before ALJ Sutker. (*Id.*) Plaintiff asserts that the older records reveal "severe mental health problems with two mental hospitalizations" as well as opinions restricting her to only one- to two- step tasks. (*Id.*) The Commissioner maintains that the factors that might make evidence from a prior disability claim relevant are not present in this case, and that none of the records from Plaintiff's prior case relate to the period at issue in this case. (Doc. 15 at 11.)

It is undisputed that, in the course of Plaintiff's appeal to the Appeals Council in this case, the Appeals Council added about 800 pages of material to the record, consisting of exhibits in the prior case before ALJ Sutker. (AR 41–838.) ALJ Menard reviewed ALJ Sutker's decision and found no basis to disturb it. (AR 24.) The court has carefully reviewed ALJ Sutker's December 3, 2014 decision and the 800 pages of material that the Appeals Council added to the record in this case.

ALJ Sutker's decision mentions that Plaintiff alleged difficulty with her memory. (AR 960.) But ALJ Sutker gave little weight to the opinion of William Cote, APRN, LADC, who opined that Plaintiff's anxiety and depression limited her to understanding and remembering very simple 1- to 2-step tasks. (*Id.*) ALJ Sutker's RFC limited Plaintiff to performing "uncomplicated" tasks in environments without strict production quotas or timed tasks, but did not limit her to 1- to 2-step tasks, and included no other limitations related to memory. (AR 957–58.) Regarding Plaintiff's prior mental health inpatient treatment, ALJ Sutker found that those treatments related to exacerbations in symptoms related to stressors and discontinuing medication. (AR 959.) Plaintiff was otherwise "relatively stable with counseling and medication." (*Id.*)

ALJs have an "independent duty to develop the record." *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 306 (2d Cir. 2011). Because of the non-adversarial nature of a benefits proceeding—even where a claimant is represented by counsel—an ALJ "is under an affirmative obligation to develop a claimant's medical history" when there are "deficiencies" in that record. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). Social Security regulations can require an ALJ to obtain a claimant's prior disability file if it was "reasonably necessary for the full presentation of [the] case." *DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) (alteration in original) (quoting 20 C.F.R. § 416.1450(d)(1)); *see also Molina v. Colvin*, No. c13-CV-6532 CJS, 2014 WL 4955368, at *7 n.11 (W.D.N.Y. Oct. 2, 2014) ("An ALJ will generally find that evidence in a prior claim(s) file is necessary for a full adjudication of the issues when the ALJ determines: There is a need to establish a longitudinal medical, educational, or vocational history; or The impairment is of a nature that evidence from a prior folder could make

a difference in establishing whether disability is present in the current claim." (quoting Hallex I-2-1-13)).

There is no basis to conclude that ALJ Menard was required to obtain or review Plaintiff's prior disability file. ALJ Menard had a complete record of evidence for the time period under consideration. If ALJ Menard had reviewed the prior record, he would have found occasional mentions of some memory loss related to discontinuing medication (AR 154, 156, 160, 233), but otherwise numerous notations of intact and normal short-term and long-term memory throughout the period between 2011 and 2014. (*See* AR 88, 121, 123, 142, 145, 148, 150, 152, 159, 236, 379, 408, 587, 717, 779.) Plaintiff's prior inpatient treatment would not have affected ALJ Menard's decision any more than it affected ALJ Sutker's decision. Prior opinions limiting Plaintiff to 1- to 2-step tasks (AR 206, 324) appear to be from a time when Plaintiff reported decreased memory after discontinuing a medication. In any case, ALJ Sutker expressly considered Mr. Cote's opinion on that issue and gave it "little weight."

## Conclusion

Plaintiff's motion to reverse (Doc. 12) is DENIED, the Commissioner's motion to affirm (Doc. 15) is GRANTED, and the decision of the Commissioner is AFFIRMED.

Dated at Rutland, in the District of Vermont, this 8 day of January, 2019.

Geoffrey W. Crawford, Chief Judge
United States District Court